**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| EGAN MARINE CORPORATION and<br>SERVICE WELDING AND SHIPBUILDING,<br>LLC, | )<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| vs. | )    Case No. 05 C 5295<br>) |
| GREAT AMERICAN INSURANCE<br>COMPANY OF NEW YORK, | )<br>)<br>)<br>)<br>)<br>) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

     Egan Marine Corporation and Service Welding and Shipbuilders, LLC allege that Great American Insurance Company of New York breached its ocean marine pollution liability policy (the policy) by refusing to provide coverage for one of two vessels involved in an explosion and fire on the Chicago Sanitary and Ship Canal. Egan and Service Welding also claim that Great American breached its duty of good faith and fair dealing by wrongly denying coverage and failing to communicate with its insureds with respect to their claim for coverage. The parties have cross-moved for summary judgment. On May 23, 2007, the Court ordered the parties to file supplemental briefs on several issues that had not been well developed in the prior briefs. For the following reasons, the Court grants Great American's motion for summary judgment and

denies Egan and Service Welding's motion for summary judgment.

## Facts

On January 19, 2005, two vessels owned by Egan Marine were traveling the Chicago Sanitary and Ship Canal. Lisa E, a tugboat, was towing a tanker barge designated EMC 423. The EMC 423 was a "dumb barge," meaning that it had no crew, self-propulsion, or navigation systems of its own. It was entirely dependent on the tugboat. The vessels docked at the ExxonMobil refinery in Joliet to load what the Lisa E's crew believed to be clarified slurry oil for transport to Ameropan Oil Co. in Cook County. Unbeknownst to the Lisa E's crew, however, the refinery loaded petroleum from a "hot" tank that contained volatile petroleum products. While the Lisa E and the barge were passing near the Cicero Avenue Bridge, the petroleum on the barge exploded and started a fire. Though not certain (and not important for this coverage action), it appears that the explosion was caused when the barge passed underneath high voltage wires that may have ignited the petroleum vapors. One of the Lisa E's crew members was thrown overboard as a result of the explosion.

After the explosion, the crew of the Lisa E jumped on the barge, refastened it to the tugboat, and proceeded to move the barge out of the channel to a dock nearby where it sank. The crew of the Lisa E then disconnected from the barge, which was afire, and began searching for their missing crewmate. As a result of the explosion and fire, some of the petroleum cargo carried by the barge discharged into the canal. The Coast Guard arrived in the evening. It ordered the Lisa E to end its search for its missing crewmate and move within the oil containment boom that had been placed around the sunken EMC 423.

Egan contacted Great American to report the accident. Great American dispatched

Meredith Management Company to the scene to assume control of containing and cleaning up the oil that has spilled from the EMC 423. Meredith and Great American appointed Dennis Egan as salvage master and entered into a contract with Service Welding to provide salvage and pollution remediation support. In the months that followed, Egan Marine and Service Welding assisted in the remediation of the pollution that resulted from the explosion. The crews were able to eventually raise the EMC 423 and tow it to the Service Welding facility in Lemont, Illinois.

The policy Great American issued to Service Welding named Egan Marine as an additional insured and contains a schedule of vessels identifying the Lisa E and EMC 423. Service Welding paid $2,592 for $5,000,000 of insurance coverage relating to the Lisa E, and $6,552 for $5,000,000 of coverage relating to the EMC 423. The policy defines an "incident" as "an event that exposes [the named insureds] to liability under OPA90 or CERCLA or FWPCA for which Section B provides coverage."[1] Pl. LR 56.1 Stat. ¶ 61. Section B states that

> [c]overage applies to all Vessels listed on the Declarations Page or on the Schedule of Vessels page, for incidents that occur during the effective period of this policy . . . Subject to all EXCLUSIONS and LIMITATIONS in Sections C and D, and subject to all the terms and conditions in the Policy, We will indemnify You for the following ten coverages.
> ...
>
>     5.    Miscellaneous Spill Liability – Costs and expenses paid by You to mitigate liabilities for incidents where such occurrences are insured by this policy, but subject to our WRITTEN EXPRESSED PRE-APPROVAL.

---

[1] OPA90 is the Oil Pollution Act of 1990, 33 U.S.C. §§ 2702-2720. CERCLA is the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675. FWPCA is the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1376.

6. Defense costs – Costs and expenses paid by You to investigate and pursue a legal defense against claims or liabilities insured by this Policy. This coverage will terminate upon payment of judgments or settlements which exhaust the amount of insurance as stated in the Declarations Page of this policy.

7. Firefighting and Salvage – Firefighting, salvage, offloading, and disposal of cargo, but ONLY to the extent that such actions contribute to stopping a discharge or release, OR prevent a substantial threat of a discharge or release under OPA90, CERCLA, or the FWPCA.

8. Limited Administrative Penalties – Your liability under the section of the . . . [FWPCA] . . . that was amended by OPA90 to allow for administrative penalties against You under Section (b)(6)(A)(i) of the FWPCA. The maximum amount of insurance payable by this Policy for this coverage is two hundred and fifty thousand dollars ($250,000) per incident, per Vessel, and shall be a separate limit from the amount of insurance shown elsewhere in the Policy. Penalties imposed under any other section of FWPCA, any other Federal Statute, or the laws of any State or subdivision thereof are specifically EXCLUDED.

9. Public Relations – Sixty percent of the costs and Expenses paid by You with our prior written consent for public relations during the removal phase of an incident arising out of a claim covered elsewhere in this policy. The maximum amount of insurance payable by this policy for this coverage is one hundred thousand dollars ($100,000) per incident, per Vessel, and shall be a separate limit from the amount of insurance shown elsewhere in the policy.

*Id.* ¶ 62. Finally, the policy states that

> [t]he Amount of Insurance stated in the Declarations Page is the most we will pay under this Policy for the total coverages B.1 through B.7. above for any one Vessel in any one incident . . . . If more than one Vessel is shown on the Declarations Page or the Schedule of Vessels of this Policy, then the Amount of

4

> Insurance shown on the Declarations Page applies separately to each Vessel for each incident.

*Id.* ¶ 63.

The parties dispute whether the policy provides coverage for just the EMC 423, the vessel that discharged the pollution, or both the EMC 423 and the tug Lisa E because the Lisa E was towing the barge at the time of the explosion. Plaintiffs also contend that Great American's lack of communication and refusal to provide coverage for the Lisa E constitutes a breach of its duty of good faith.

## Discussion

Egan and Service Welding's complaint asserts that the Court has jurisdiction based on the federal courts' original jurisdiction over admiralty cases (28 U.S.C. § 1333(1)), and on diversity of citizenship (28 U.S.C. § 1332(a)). Compl. ¶¶ 7, 13. Because plaintiffs asserted diversity jurisdiction, and Service Welding is a limited liability company, the Court ordered plaintiffs to file an amended complaint disclosing the citizenship of each member of the LLC to determine whether diversity jurisdiction was appropriate. *See Mutual Assignment & Indemnification Co. v. Lind-Waldock & Co., LLC*, 364 F.3d 858, 861 (7th Cir. 2004); *Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998). Egan responded by filing a motion to reconsider, essentially dropping its contention that the Court has diversity jurisdiction and asserting only jurisdiction based on 28 U.S.C. § 1333(1). The Court points this out because the Seventh Circuit has held that it is important in admiralty cases for courts to be clear regarding the basis of jurisdiction so the parties know what procedures apply. For example, "[w]hen an admiralty case is also within federal jurisdiction on another basis, such as diversity, the parties

are not entitled to invoke any of the special procedures or remedies of admiralty." *Continental Cas. Co. v. Anderson Excavating & Wrecking Co.*, 189 F.3d 512, 517 (7th Cir. 1999). Here, the Court sits only in admiralty.

When a district court rules on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Entry of summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The fact that both parties have filed cross-motions for summary judgment does not change the applicable standard. The Court must consider each motion independently and must deny both motions if there is a genuine issue of material fact. *See Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993); *St. Paul Travelers Co., Inc. v. Corn Island Shipyard, Inc.*, 437 F. Supp. 2d 837, 840 (S.D. Ind. 2006); *Harms v. Lab. Corp. of Am.*, 155 F. Supp. 2d 891, 905-06 (N.D. Ill. 2001).

The Great American policy includes a choice-of-law provision stating that "[t]he terms of this [p]olicy shall be construed pursuant to, and the right of the parties hereto shall be governed and controlled by, the general maritime law of the United States; and in the absence thereof, the laws of the State of New York." Def. LR 56.1 Stat., Ex. 1 ¶ 18. Neither party disputes the validity of the choice-of-law provision, nor have the parties or the Court located any federal or New York case law that specifically addresses the relevant terms of the policy.

The choice of law provision is consistent with precedent holding that state law controls disputes involving marine insurance policies "in the absence of a federal statute, a judicially

6

fashioned admiralty rule, or a need for uniformity in admiralty practice." *Bohemia, Inc. v. Home Ins. Co.*, 725 F.2d 505, 510 (9th Cir. 1984). Here, there are two relevant policy provisions: the section that provides coverage for "[f]irefighting, salvage, offloading, and disposal of cargo, but ONLY to the extent that such actions contribute to stopping a discharge or release, OR prevent a substantial threat of a discharge or release under OPA90, CERCLA, or the FWPCA," and the provision stating that "[i]f more than one Vessel is shown on the Declarations Page or the Schedule of Vessels of this Policy, then the Amount of Insurance shown on the Declarations Page applies separately to each Vessel for each incident." Pl. LR 56.1 Stat. ¶¶ 62, 63. Because the parties have not cited any controlling federal authority regarding the interpretation of these policy provisions, and the Court has been unable to find any, the Court applies general New York rules of insurance policy construction to resolve this coverage matter.

When addressing an insurance coverage dispute, New York courts "'must determine the rights and obligations of parties under an insurance contract based on the policy's specific language.'" *Pepper v. Allstate Ins. Co.*, 799 N.Y.S.2d 292, 294 (N.Y. App. Div. 2005), quoting *State Farm Mut. Auto. Ins. Co. v. Glinbizzi*, 780 N.Y.S.2d 434, 435-36 (N.Y. App. Div. 2004). New York law also provides that

> where the provisions of an insurance policy are clear, the contract must be enforced as written . . . A court may neither make nor vary an insurance contract by extending coverage beyond the fair intent and meaning of the agreement, and the liability of the insurer cannot be enlarged by implication beyond the express terms of the contract.

*Moshiko, Inc. v. Seiger & Smith, Inc.*, 529 N.Y.S.2d 285, 287-88 (N.Y. App. Div. 1988). With these policy construction principles in mind, the Court turns to the policy provisions at issue.

7

The Great American policy pays $5 million "per vessel, per incident." The policy defines "incident" as "an event that exposes you to liability under OPA90 or CERCLA or FWPCA for which Section B provides coverage." Pl. LR 56.1 Stat. ¶ 62. The policy defines "you" as the named insureds, Service Welding, Egan Marine, Egan Marine Tankering, and Dennis Egan. Pl. LR 56.1 Stat., Ex. D. The parties clarified in their supplemental briefs that plaintiffs were not exposed to liability under CERCLA or FWPCA, and thus the only statute at issue is "OPA90," the Oil Pollution Act of 1990. The policy does not define the word "exposes," and the parties do not suggest an interpretation. But New York courts give terms in insurance policies their plain and ordinary meaning. *Gassman v. Metro. Life Ins. Co.*, 830 N.Y.S.2d 272, 274 (N.Y. App. Div. 2007) (citation omitted). Exposes means "to submit or subject to an action or influence." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 802 (unabr. ed. 1993). Therefore, if Egan is not subject to fines or other penalties under OPA90 as owner of the Lisa E, the Lisa E was not invovled in an incident.

Egan contends that both the Lisa E and the EMC 423 were involved in an "incident" because the Lisa E controlled the EMC 423 at the time of the explosion, and therefore it is entitled to $10 million in coverage ($5 million for the Lisa E and $5 million for the barge). Great American contends that the Lisa E was not involved in an incident because the oil leak resulting from the explosion came from the EMC 423, not the Lisa E. It argues that the Coast Guard "designated the EMC 423 as the vessel responsible for the [s]pill and never found that the Lisa E was in any way responsible." Def. Resp. Brief at 7.

Egan misreads the policy language. Whether the Lisa E was tugging the EMC 423 at the time of the spill does not determine whether the policy affords coverage. What matters is

8

whether the Lisa E was involved in an event that exposed it to liability under OPA90. If so, then the policy provides a separate $5 million of coverage for the Lisa E, in addition to the $5 million of insurance coverage for the EMC 423. There is no doubt that the explosion aboard the EMC 423 exposed Egan Marine to liability under OPA90 with respect to that vessel. Indeed, the Coast Guard wrote that it "formally designate[d] the BARGE EMC423 as the source of the discharge and notif[ied] [Egan] that as its owner/operator, you incur certain legal responsibilities to the U.S. Government and others damaged by this incident." Def. LR 56.1 Stat. ¶ 16. By contrast, though the Lisa E was involved in the event that gave rise to the incident that afforded insurance coverage to Egan as owner of the EMC 423, the record includes no evidence from which a finding reasonably could be made that Egan was exposed to liability under OPA90 due to its ownership or operation of the Lisa E. To the contrary, the Coast Guard found Egan liable because the EMC 423 was the responsible vessel; Egan was never subject to liability because it owned the Lisa E.

Egan points to several cases in which courts found that a tug towing a barge that spilled oil was subject to liability under OPA90. Each of these cases, however, is distinguishable. For example, in *Commw. of Puerto Rico v. M/V Emily S*, 13 F. Supp. 2d 147 (D.P.R. 1998), the Coast Guard found both a tug and a barge that spilled oil to be responsible vessels. As a result, the court found that "both the tug . . . and the barge . . . must be considered a 'discharging vessel' under the terms of OPA, making the tug's owner . . . a 'responsible party' for the oil spill." *Id.* at 150. In the present case, however, the Coast Guard did not determine that the tug was a responsible vessel. In *Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*, 924 F. Supp. 1436 (E.D. Va. 1996), the owner of a vessel struck by a tug during undocking, resulting in

9

an oil spill, sought contribution from the tug owner under a provision of the OPA that allows a third party to seek contribution from another entity that is liable under OPA. *See* 33 U.S.C. § 2709. The court held a bench trial, issued findings of fact, and concluded that the third party "presented ample evidence at trial to prove [the tug's] negligence." *Nat'l Shipping*, 924 F. Supp. at 1450. In this case, by contrast, Egan has provided no evidence that the tug's crew was responsible for the explosion, and neither a court nor the Coast Guard has made such a determination. To the contrary, Egan has denied that the explosion was a result of the tug crew's fault or negligence. Pl. LR 56.1 Stat., Ex. I ¶¶ 7, 11.

Similarly, in *Seaboats, Inc. v. Alex C Corp. et al.*, Nos. Civ. A. 01-12184, 01-12186, 00-12500, 2003 WL 203078 (D. Mass. Jan. 30, 2003), a tug assisting an oil tanker collided and punctured the hull of the tanker, resulting in a large fuel spill into Boston Harbor. *Id.* at *1. The Coast Guard designated the tanker owner as the responsible party under OPA90. The owner of two vessels in the vicinity of the oil spill sought damages from the tug and tanker owners involved in the spill, and the tanker owner sought contribution from the tug owner. Contrary to Egan's representations, the court in *Seaboats* did not hold "that a tug that was assisting a tanker was liable under OPA90." Pl. Supp. Brief at 6. Rather, the tug owner apparently conceded liability and sought merely to limit the amount it had to pay. *Seaboats*, 2003 WL 203078, at *2. The court's decision dealt with sections of OPA90 that provided for contribution and subrogation and the limitations of liability applicable to each. The court concluded that the tanker owner's suit could proceed as an action for contribution (33 U.S.C. § 2709) and subrogation (33 U.S.C. § 2715). Because Egan owns both the tug and the barge and denies that the tug was responsible for the explosion, *Seaboats* is not on point.

In sum, because there is no evidence in the record that Egan has been exposed to liability under OPA90 as operator of the Lisa E, Great American is entitled to summary judgment. Because the Court finds that the Great American policies do not provide coverage for the explosion aboard the EMC 423 beyond the $5 million Great American has already paid, Great American is also entitled to summary judgment on Egan's bad faith claim.

**Conclusion**

As outlined above, the Court grants Great American's motion for summary judgment [docket no. 47] and denies Egan and Service Welding's motion for summary judgment [docket no. 36]. Egan's motion for extension of time is terminated as moot [docket no. 49]. The Clerk is directed to enter judgment in favor of the defendant.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: June 13, 2007