# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **EGAN MARINE CORP. and SERVICE WELDING AND SHIPBUILDING, LLC,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 05 C 5295** |
| **GREAT AMERICAN INSURANCE COMPANY OF NEW YORK,** | ) ) ) | |
| **Defendant.** | ) ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

The plaintiffs, Egan Marine Corp. (EMC) and Service Welding and Shipbuilding, LLC (SWS), have sued their marine insurer, Great American Insurance Company of New York (GAIC), for breach of the insurance contract and for the tort of bad faith claims handling. This case is before the Court pursuant to admiralty jurisdiction. 28 U.S.C. § 1333(1). *See Norfolk Southern Ry. Co. v. Kirby*, 543 U.S. 14, 23-24 (2004) (action for breach of contract falls within admiralty jurisdiction if contract concerns maritime transactions); *St. Paul Fire & Marine Ins. Co. v. Lago Canyon, Inc.*, 561 F.3d 1181, 1184 (11th Cir. 2009); *Continental Cas. Co. v. Anderson Excavating & Wrecking Co.*, 189 F.3d 512, 517 (7th Cir. 1999).

The Court previously granted partial summary judgment in plaintiffs' favor as to certain liability issues on the breach of contract claim. *See Egan Marine Corp. v. Great Am. Ins. Co. of N.Y.*, No. 05 C 5295, 2009 WL 2515630 (N.D. Ill. Aug. 14, 2009). The

Court conducted a bench trial on all remaining issues from January 12 through January 15, 2010. This constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

**Facts**

EMC is in the business of transporting products on waterways. SWS runs the shipyard where EMC keeps its vessels and repairs and maintains those and other watergoing vessels. Dennis Egan is the principal of both EMC and SWS.

**1.     The GAIC insurance policy**

EMC and SWS obtained a marine insurance policy from GAIC for the time period at issue in this case. The policy covered a number of EMC vessels, including the two involved in this case, for "incidents" during the policy's effective period. The term "incident" was defined as "[a]n event that exposes You to liability under **OPA90** or **CERCLA** or **FWPCA** for which Section B [of the policy] provides coverage." Pl. Ex. 1, Section A (emphasis in original). "OPA90" is a reference to the Oil Pollution Act of 1990, 33 U.S.C. § 2702.

The policy stated that GAIC would indemnify EMC and SWS for the following coverages, among others:

> **1.     OPA90** (Federal) - Removal costs and expenses paid by You under Section 1002 of **OPA90** (33 U.S.C. Section 2702), for which liability would have been imposed under the Laws of the United States if You had not voluntarily undertaken the removal of oil.

> **2.     OPA90** (State) - Your liability under State law for those removal costs and expenses referred to in Section 1002 (33 U.S.C. Section 2702) of **OPA90** but only to the extent that these could have been recovered under **OPA90**.

**3.     OPA90** - Your costs and expenses You have paid either in avoiding or mitigating the liability in **1.  OPA90** (Federal) or **2.  OPA90** (State) as described above.

**4.     CERCLA** - Costs and expenses You have paid where liability would have been imposed upon You if You had not acted voluntarily under 107(a)(1)(A) and (B) of **CERCLA** (42 U.S.C. Section 9607(a)(1)(A)) and with specific regard to "removal" "response" or "remedial action" as these terms are defined and applied under Section 101(23) - (25) of **CERCLA** (42 U.S.C. Section 9601(23) - (25)).  This coverage includes claims for contributions [sic] under Section 1013(f)(1) of **CERCLA** (42 U.S.C. Section 9613(f)(1)).

**5.     Miscellaneous Spill Liability** - Costs and expenses paid by You to mitigate liabilities for incidents where such occurrences are insured by this policy, but subject to our **WRITTEN EXPRESSED PRE-APPROVAL.**

**6.     Defense Costs** - Costs and expenses paid by You to investigate and pursue a legal defense against claims or liabilities insured by this Policy.  This coverage will terminate upon payment of judgements [sic] or settlements which exhaust the amount of insurance as stated in the Declarations Page of this policy.

**7.     Firefighting and Salvage** - Firefighting, salvage, offloading, and disposal of Cargo, but **ONLY** to the extent that such actions contribute to stopping a discharge or release, **OR** prevent a substantial threat of a discharge or release under **OPA90, CERCLA,** or the **FWPCA**.

**8.     Limited Administrative Penalties** - Your liability under the section of the Federal Water Pollution Control Act **("FWPCA")** that was amended by **OPA90** to allow for administrative penalties against You under Section (b)(6)(A)(I) of the **FWPCA**.  The maximum amount of insurance payable by this Policy for this coverage is two hundred and fifty thousand dollars ($250,000) per incident, per Vessel, and shall be a separate limit from the amount of insurance shown elsewhere in the Policy.  Penalties imposed under any other section of **FWPCA**, any other Federal Statute, or the laws of any State or subdivision thereof are specifically **EXCLUDED**.

. . .

*Id.*, Section B (emphasis in original).  The policy provided $5,000,000 in coverage for each listed vessel.

The GAIC policy required EMC and SWS to provide "IMMEDIATE NOTICE of the occurrence of any incident which is potentially covered by POLICY and/or to which You may have liability or as to which You may be required to enter a defense." *Id.*, Section E ¶ 11 (emphasis in original). The policy also provided that the "cooperation" of EMC and SWS "is required as a condition of this insurance" and that their "failure to provide such assistance and cooperation . . . entitles US to withhold, cancel, deny, or refuse any payments that might otherwise be due under this Policy." *Id.*, Section E ¶¶ 2 & 4. The policy states that its terms "shall be construed pursuant to, and the rights of the parties hereto shall be governed and controlled by, the general maritime law of the United States; and in the absence thereof, the laws of the State of New York." *Id.*, Section E ¶ 18.

**2. The barge explosion**

In January 2005, EMC was hired to transport several loads of clarified slurry oil (CSO) from the Exxon / Mobil refinery in Joliet, Illinois to Ameropan Oil Company via the Chicago Sanitary and Ship Canal. The CSO was loaded onto an EMC tank barge called the EMC 423, which was connected to and pushed by another EMC vessel, a tugboat called the Lisa E. Both the Lisa E and the EMC 423 were listed vessels under the GAIC insurance policy. The EMC 423 had no means of self-propulsion and no crew of its own. The crew of the Lisa E made the navigation decisions concerning the barge and also served as the barge's crew.

On January 19, 2005, while transporting one of the loads of CSO, an explosion occurred aboard the EMC 423 just as it passed under the Cicero Avenue bridge on the

canal. One crew member was killed. The rest of the crew was able to reconnect the barge to the Lisa E, and the Lisa E's captain was able to move the barge to the side of the canal near a dock before it sank there. Some of the CSO was discharged into the canal as a result of the explosion, but most of it remained on board the EMC 423.

### 3.    The immediate aftermath of the explosion

An emergency coordinator from the United States Coast Guard summoned a company called Heritage Environmental to remediate the scene. Heritage set up a "containment boom" around the barge (though the barge had sunk, part of it was still above water due to the canal's shallow depth). The Coast Guard emergency coordinator first ordered that the Lisa E be moored to a dock and later ordered that it be moved within the containment boom. Heritage performed a cleanup of the Lisa E.

EMC immediately notified GAIC and Gulf Coast Marine, EMC's "protection and indemnity" insurer. Pursuant to a provision of the GAIC policy stating that the insurer would provide "spill management" services, GAIC contacted its retained emergency response consultant, Meredith Management Group, Inc., to support EMC in its response to the incident. Meredith dispatched Thomas Neumann to the site. Neumann arrived on January 20. It is undisputed that Neumann acted on behalf of GAIC in dealing with Dennis Egan and his companies.

On January 21, the Coast Guard sent EMC a letter designating the EMC 423 as the source of the discharge of oil into the canal. On January 26, the Coast Guard issued a "notice of federal interest" advising EMC that it may be financially responsible for the incident and that, as responsible party, it may be liable for removal costs and damages and was required to cooperate with the federal "on-scene coordinator," a

Coast Guard officer. The Coast Guard also directed EMC to remove the discharge. That same date, Dennis Egan sent the Coast Guard on-scene coordinator a letter advising that he had established a response team and designating Neumann as the "incident commander." As such, Neumann was responsible for coordinating the response to the incident.

**4.     GAIC's arrangement with EMC and SWS**

Upon arriving in Chicago, Neumann had discussions with Egan regarding the response to the incident. Following these discussions, Neumann agreed on behalf of the insurers to have Egan act as the salvage master to attempt to raise the EMC 423 from the canal. This operation had the dual purpose of salvaging the vessel and remediating actual and potential pollution. With Neumann's approval (on the insurers' behalf), EMC engaged its related entity SWS to conduct the salvage operation. The Coast Guard also approved the involvement of EMC and SWS.

At the time Neumann engaged EMC and SWS, Egan provided Neumann with rate sheets for both entities, listing their regular rates. *See* Pl. Ex. 15. The SWS rate sheet identified the regular per-hour rates for various categories of SWS employees (supervisors, welders, and laborers), as well as the per-hour or per-day rates for various types of equipment or services. The rate sheet for EMC that Egan provided to Neuman listed per-hour and per-day rates for boats and barges. The boat and barge rates, Egan explained to Neumann, included charges for the employee time involved in operating the vessels.

As noted earlier, the GAIC insurance policy covered "[r]emoval costs and expenses" under OPA90 (among other things). Both Egan and Neumann understood

and agreed that under the terms of the policy, EMC and SWS would have to do the work at cost. Egan understood that this meant that they could not make a profit.

Egan proposed to bill at rates of twenty percent less than the companies' listed rates. Egan proposed that SWS would bill only for employee time and that charges for the use of certain types of machinery and equipment, such as pumps and forklifts, would be included in the employee rate. Egan agreed to do this even though SWS's rate sheet contemplated separate charges for the use of such equipment. In addition, Egan said he would not charge for his own time as salvage master, work for which Egan testified one ordinarily would charge $1,500 per day. Neumann testified that he understood that general overhead expenses associated with the project were incorporated into the hourly per-employee / per-boat charges. Egan told Neumann that the reduced rates represented EMC and SWS's cost of operations.

Egan and Robin Chanda, EMC's secretary / treasurer and SWS's controller, both believed, honestly in the Court's view, that the discounted rates represented the two entities' costs and eliminated any profit. Chanda testified that in August 2004, she and Egan looked at the companies' finances and determined that they were not making a profit. After consulting with the companies' outside accountant, Kenneth Iwanicki, they raised the companies' rates by twenty-five percent to try to get them back into the black. When Egan quoted rates to Neumann for the salvage and recovery work, he and Chanda figured that a twenty percent reduction from the new rates would eliminate the companies' profit and result in bills being at or approximately at the companies' cost, including overhead. The effect of the twenty percent reduction was to reduce the rates to what the companies had been charging before the August 2004 rate increase (100 +

25% = 125, less 20% = 100).  This, Egan and Chanda believed, approximated a break-even rate.  Plaintiffs did not, however, introduce in evidence any accounting analysis performed either at that time or since to support Egan and Chanda's beliefs.

Egan contended at trial that Neumann agreed up front to pay the rates Egan quoted for EMC and SWS.  The Court rejects this contention.  Among other things, it is directly contradicted by the contemporaneous and near-contemporaneous documentary evidence.  The contemporaneous evidence includes the purchase order that Neumann issued on January 24, 2005.  *See* Def. Ex. 3.  The purchase order lists the following as the "description of material or service" to be provided:  "Time and material charges *on a cost reimbursable basis* to salvage the vessel and remove cargo from vessel as appropriate. . . ."  *Id.* (emphasis added).  It lists the "estimated or agreed price" as "*Cost basis and subject to review*."  *Id.* (emphasis added).  The near-contemporaneous evidence includes payment authorization forms that Neuman submitted to Meredith to obtain partial payment of EMC and SWS invoices, at least some of which were shown to EMC / SWS personnel.  *See* Def. Exs. 39-49.  Each of these forms included a hold-back amount described, consistent with the original purchase order, as "pending audit of invoice and review of cost basis."  *See, e.g.,* Def. Ex. 39.  Some of the invoices also included the notation "The rates used on this invoice are list minus 20% and *this position as a cost basis is subject to review*."  *See* Def. Exs. 39 & 40 (emphasis added).  This evidence makes it clear that Neumann did not agree up front to pay the rates Egan had quoted.  Rather, both Egan and Neumann understood that the rates were subject to later review to determine whether they actually represented EMC and SWS's cost.

Neumann did agree, however, that EMC and SWS could bill using the method that Egan proposed.  In other words, he did not express any problems or concerns with Egan's proposal to bill for SWS on a per-employee basis with certain machinery and equipment costs included and for EMC on a per-vessel basis with employee costs included (including Egan's own time as salvage master).  Neumann did not contend during his testimony, nor did GAIC offer any other evidence, that Egan or anyone else with EMC or SWS was told at or near the outset of their work that their invoices had to be broken down on any basis different from the manner that Egan proposed and Neumann accepted.

As the Court has found, Neumann made it clear to Egan up front that the rates the two entities were charging were subject to later review.  Egan understood that this meant EMC and SWS's invoices would be reviewed to ensure they actually represented the entities' costs.  Neumann did not, however, provide a definition of "cost."  Similarly, he did not describe, nor did he or Egan discuss, how the later review of the invoices would be conducted or how the accuracy of EMC and SWS's claimed costs would be determined.  The failure to iron this out at the outset of the project likely was attributable to the need to start work immediately.  But the absence of an understanding regarding how "cost" would be determined led directly to this litigation.

**5.      The salvage and response work**

EMC and SWS used all or nearly all of the resources at their disposal – all their workers and equipment, and many of their boats – to conduct the salvage operation.  This included using EMC's boats to shuttle other companies' barges past the wreck, as directed by the Coast Guard.  EMC / SWS was able to raise the barge intact, with the

CSO still in it.  This was an unusually difficult operation that EMC / SWS performed skillfully.  Due to their work on this project, EMC / SWS had little or no other work of significance during the period from the date of the barge explosion through at least the end of April 2005.

Once the EMC 423 was raised, the Coast Guard permitted EMC / SWS to move the barge to the SWS shipyard.  On May 18, Captain T.W. Carter, the Coast Guard's on-scene coordinator, issued a letter to EMC entitled "termination of emergency response."  Def. Ex. 8.  By this date, it appears, the barge had been moved to the SWS shipyard.  Carter's letter stated that Coast Guard staff had confirmed that the barge "no longer represents a substantial threat of a discharge of oil or a hazardous substance." *Id.*  Carter stated that pursuant to his authority as on scene coordinator, "that portion of this emergency response relating to the barge EMC 423 and the cargo contained therein, and related to the cargo contained in the tank barge EMC 506 is complete, effective at the time the EMC 423 was successfully moored" at SWS's shipyard.  *Id.* The letter further stated that "[t]he only remaining emergency removal operations that remain under aegis of my [federal on-scene coordinator] authority are the operations related to the removal of the oil related to this incident which remains on the bottom of the [canal] in the vicinity of the original explosion, fire and subsequent removal operations."  *Id.*

Also on May 18, Captain Carter, this time in his capacity as the Coast Guard's captain of the port, issued a separate letter to EMC entitled "caption of the port order." Def. Ex. 9.  In this letter, Carter directed EMC to remove the remaining oil from the EMC 423 by no later than May 28, stating that the barge "is no longer certified or fit for

service to carry oil or hazardous material in accordance with 46 CFR § 31.01." *Id.* This order concerned the Coast Guard's regulatory power to inspect and certify tank vessels, not Carter's authority as on-scene coordinator of the response to the oil spill.

On June 7, 2005, Captain Carter sent a letter to the Illinois Environmental Protection Agency (IEPA). Def. Ex. 10. The letter briefly summarized the recovery work involving removal of the discharged oil. Carter stated that "[s]ome oil apparently remains in pockets over a broad area on the bottom of the [canal]" but that, for reasons he described, recovery of that oil would be "counter productive to [IEPA] site remediation efforts" and that "further oil *recovery* actions are incompatible with IEPA's ultimate site *remediation* standards and that these standards preclude further oil *recovery* at this site." *Id.* (emphasis in original). In his capacity as federal on-scene coordinator, Carter stated, "I therefore declare *recovery* for this spill event complete and offer my assistance to IEPA in completion of site *remediation*." *Id.* (emphasis in original). The letter also noted Carter's understanding that the IEPA would be "seeking complete site *remediation* from the vessel owner," EMC. *Id.* (emphasis in original).

After the EMC 423 was taken to the SWS yard, the CSO that was still in the barge's storage tanks was removed, loaded onto another barge, and delivered to EMC's customer. No evidence was introduced regarding when exactly this was done. A good deal of CSO remained aboard the EMC 423 in areas outside the tanks, where it had been spread by the explosion. Neumann testified that the IEPA insisted that the residue be removed from the EMC 423. *See also* Pl. Ex. 20. This required further work on the part of EMC / SWS. They performed some of this work, through approximately

August 2005. *See* Pl. Ex. 10 (admitted over objection). But after GAIC stopped making payments to EMC / SWS under the insurance policy, they could no longer afford to conduct further cleanup efforts on the barge. The barge remains in storage at the SWS yard to this day.

The IEPA issued EMC a notice in early September 2005 that it had violated the law in connection with its removal of the petroleum residue from the EMC 423. Specifically, the IEPA contended that the disposal of the residue threatened further contamination of the canal, among other things. In response to the notice, EMC was required retained counsel and an environmental consultant, and it conducted further cleanup work. *See generally* Pl. Ex. 8. Plaintiffs introduced evidence that they paid the consultant $10,215. *See id.* The Court was unable to locate in the evidence, however, any support for plaintiffs' contention that they incurred $18,400 in attorney's fees, $9,440 in disposal costs, or $72,320 in labor and machinery costs relating to the cleanup following the IEPA's notice.[1]

**6.    The review of EMC and SWS's invoices**

Due to the agreed-upon method of billing, EMC and SWS did not keep track of Egan's time or of the time of use of equipment for which SWS ordinarily would have charged separately. Nor did EMC break down in its invoices the time put in by crew members working on boats and barges for which EMC billed on a per-day or per-hour basis. Neither Neumann nor anyone else from Meredith asked EMC or SWS, in the

---

[1]  The Court will entertain a motion to alter the judgment if plaintiffs can identify where the support for these expenses appears in the voluminous documentary evidence that was offered and admitted at trial.

early stages of their work, to record or reflect on invoices all of the components of the charges, Egan's own time, or the time of use of equipment.

Meredith brought in another consulting firm, Global Risk Solutions (GRS), to review and audit the invoices of EMC / SWS and other entities connected with the recovery work. Ross Gagliano, a GRS consultant, arrived at the site on February 12, 2005, about three weeks after work started. This was shortly after EMC / SWS had submitted their initial invoice. Gagliano worked in EMC / SWS office space.

Gagliano testified that he advised Chanda sometime in February that he would need information to support the rates EMC / SWS were charging and how they had arrived at them. He testified that Chanda said she understood, interposed no objection, and said she would get back to him, but that she did not provide any of the requested supporting information until mid-April 2005. Chanda, by contrast, testified that it was not until April that Meredith or the GRS consultants advised that EMC / SWS would have to demonstrate that the rates they were charging actually amounted to cost.

Neither witness was fully credible on this score. Chanda's testimony was at odds with the evidence, discussed earlier, showing that it was made clear at an early date that the rates were subject to audit and that EMC / SWS would have to prove that they amounted to their cost. Chanda's later delays in responding to requests for information that Meredith / GRS personnel made in mid-May (discussed below) also provide some support for the claim that she was slow in responding to earlier requests for supporting information. That said, Gagliano's testimony that he began to ask Chanda for supporting detail in February but got nothing for two months is less than credible, partly due to the lack of contemporaneous documentation or corroboration. The Court finds it

13

rather difficult to believe that someone with Gagliano's background and assigned task would have asked for this information repeatedly over an extended period, unsuccessfully, without documenting his requests in some way.[2]  The first documentation of such requests to EMC / SWS did not come until the latter part of April 2005.  The Court believes it is more likely than not that GRS / Meredith began to ask for supporting documentation a number of weeks before that, but not as early as February as Gagliano claimed.

By early April, the hold-back amounts on the EMC / SWS invoices had reached a significant dollar amount, and the Meredith / GRS personnel were becoming concerned that they had no support for the claim that EMC and SWS were billing at cost.  In mid-April, at Gagliano's request, Chanda obtained financial statements for SWS and EMC from accountant Iwanicki and provided them to GRS.  Gagliano forwarded this information to Vincent Levito, a certified public accountant employed by GRS, for analysis.

A follow-up meeting was held on April 26, 2005, which the GRS personnel documented in a memorandum.  *See* Def. Ex. 14.  The GRS personnel advised EMC / SWS at or before this meeting that the financial statements they had received did not support the claimed hourly rates.  It is not clear whether the GRS personnel (including Levito) fully appreciated prior to this meeting that the labor rates that the entities had been charging were inclusive of equipment charges and overhead expenses, as well as

---

[2]  The Court reaches the same conclusion regarding Neumann's testimony that he attempted to get supporting documentation for "months" before bringing in a certified public accountant in May 2005.

Egan's time as salvage master. During the April 26 meeting, however, Chanda provided further information regarding the entities' rates, including the fact (already known to Neumann) that the rates included equipment charges as well as Egan's time – as well as additional information that the GRS personnel might not have known previously.

At or around the time of the meeting, the Meredith / GRS personnel said they intended to conduct a from-scratch analysis of EMC and SWS's costs. They asked EMC / SWS to go back and restate the basis for the charges, including the hours of use of equipment, Egan's time, and any other embedded expenses, and that they provide additional support for labor-related charges. They advised – and Neumann testified at trial – that some allowance for overhead likely would be included in their determination of the entities' cost, but not the entirety of EMC and SWS's overhead, as it appeared to include costs unrelated to the project.

Egan and Chanda balked at doing what the Meredith / GRS personnel asked. Egan testified that he was concerned that any reconstruction would be rough at best because the entities had not kept track of his time or the hours of usage of equipment. This was a legitimate concern, though not an insurmountable one in the Court's view. It is unclear whether Egan or Chanda communicated the substance of their concern to Meredith / GRS. Partly as a result of Egan's concern, however, EMC / SWS did not provide information that Meredith / GRS considered adequate to do their from-scratch analysis of the two entities' cost.

In an effort to bring the matter to a close, Neumann obtained information from other sources regarding typical labor and equipment rates. *See* Def. Ex. 23. He also Neumann obtained authorization from GAIC to bring Levito to Chicago to try to make a

determination of EMC and SWS's costs.  Levito came to Chicago on May 13, 2005.  By this time, Chanda had obtained information about direct labor costs from EMC / SWS outside accountant Iwanicki.  Because these rates did not include overhead, charges for equipment use, or the other items that EMC / SWS had included in their charges, the rates were far below what the entities had been billing to Meredith.  This caused a good deal of concern on the part of the Meredith / SWS personnel.

When Levito met with Chanda in mid-May, he asked for additional documentation to conduct an analysis of EMC / SWS's costs.  This information was not forthcoming, at least not immediately.  Levito memorialized his requests in a memorandum in an e-mail dated May 24, 2005.  Def. Ex. 22.  Chanda was very slow in responding.  She provided some information about direct labor costs in early June and committed to provide further documentation including support for overhead.  *See* Def. Exs. 17 & 18.  But the process continued to move very slowly from EMC / SWS's end.

The GRS personnel later conducted an analysis that suggested that depending on the "at cost" labor rates used, EMC and SWS's invoices might exceed their costs by over one million dollars or by several hundred thousand dollars.  GRS never obtained information that they considered sufficient to establish actual at cost rates for EMC or SWS.

**7.     Insurance coverage and payments**

Julia Price, a divisional assistant vice president of GAIC, was aware that the insurance policy covered both the Lisa E and the EMC 423.  GAIC determined at an early date, however, that only the coverage for the EMC 423 applied, not the coverage for the Lisa E.  Price testified that GAIC based this decision on the Coast Guard's letter

to EMC containing its determination that the EMC 423 was responsible for the oil spill. She admitted, however, that GAIC did not advise EMC at the time of its decision that only the EMC 423's coverage applied. Price testified, however, that it was not until months later that she became aware that there was any contention that the Lisa E's coverage applied.

GAIC never issued a reservation of rights letter in connection with the request for coverage. Price testified that the reason for this was that no issues regarding coverage were apparent at the time GAIC became involved.

On June 13, 2005, GAIC sent SWS a letter stating that the $5 million policy limit had been exhausted by claim and expense payments. Pl. Ex. 2. Price conceded that GAIC had not actually paid $5 million to or on behalf of EMC / SWS at that point. Neumann had advised her, however, that if the amounts that GAIC had under advisement as of early June were taken into account, the total amount paid and payable would exceed $5 million. Price was also aware from Levito that based on GRS's analysis at that point, GAIC might have overpaid EMC / SWS. This, however, was not mentioned in Price's letter; it said only that the $5 million limit had already been reached, which was incorrect. Price testified that after the letter was sent, Chanda told her that the $5 million had not yet been reached. Price acknowledged to Chanda that there was more coverage, and in fact GAIC made further payments to EMC / SWS after sending the June 13 letter.

By the fall of 2005, GAIC and Meredith determined that they would not be able to make a satisfactory determination of EMC and SWS's costs due to the lack of sufficient supporting information. GAIC directed Neumann to attempt to develop a basis on

which to determine a final payment to EMC / SWS. Neumann reviewed all the information he had and came up with three figures that represented estimates of EMC and SWS's recoverable costs. The highest of these estimates was $588,317. It is apparent from the evidence that Neumann considered only the amounts invoiced through June 7, 2005, the date of the Coast Guard's letter to the IEPA declaring the recovery complete. *See* Def. Exs. 37 at 2.

Following GAIC's receipt of Neumann's three estimates, Price recommended paying EMC / SWS the highest of the three sums. She credibly testified that her intention was to give GAIC's insureds the benefit of the doubt. Price also recommended that GAIC pay an additional amount to bring the total paid up to the $5 million policy limit for the EMC 423.[3] These events took place after this lawsuit was filed. GAIC ended up making a final payment of approximately $727,000. This brought to $5 million the total paid to or on behalf of EMC and SWS. *See* Def. Ex. 37.

In February 2007, an attorney representing GAIC and EMC submitted a joint claim for reimbursement to the federal Oil Spill Liability Trust Fund; the attorney supplemented the claim in January 2008. *See* Pl. Exs. 5a & 5b. Price signed off on the claim on behalf of GAIC. The claim requests reimbursement of the total amount GAIC had paid in connection with the clean-up, including to EMC / SWS, and it does not suggest that the insurer had overpaid either of those entities. The claim also requests reimbursement of pre-June 7 amounts invoiced by SWS / EMC that GAIC had not paid.

---

[3] By this time, legal counsel for EMC had advised GAIC that the company contended that the coverage for the Lisa E also applied, and GAIC had rejected this contention. *See* Def. Ex. 36.

The claim, however, does not include any of the SWS / EMC invoices for work done after June 7, 2005.

## 8.    The Illinois EPA and US government lawsuits against Egan

On August 31, 2005, the IEPA filed suit against EMC in Illinois state court under the Illinois Environmental Protection Act (Act).  Def. Ex. 53.  The IEPA alleged that approximately 2,000 to 2,500 gallons of CSO remained at the bottom of the canal as a result of the barge explosion.  It also alleged that between May 16 and 18, during the salvage and transportation of the barge, a unnamed tugboat owned by EMC discharged thirty gallons of diesel fuel into the canal, causing an "oil sheen" on the canal's surface. The IEPA alleged that EMC had violated the Act by causing or allowing these discharges.  It requested imposition of civil penalties, an injunction against further violations, "[o]rdering [EMC] to pay all costs, including expert witness, consultant and attorney fees, expended by the State in the pursuit of this action," and "other relief as the Court deems equitable and just."  *Id.* at 6-7.

The IEPA sued EMC under sections 42(d) and (e) of the Act, 415 ILCS 5/42(d) and 42(e).  *See* Def. Ex. 53 ¶ 1.  The former provision concerns civil penalties, but the latter provision, section 42(e), permits a court to restrain ongoing violations of the Act and "to require such other actions as may be necessary to address violations" of the Act.  415 ILCS 5/42(e).  This provision, added to the Act in 2004, at least arguably permits a court to order a clean-up.  *Cf. People ex rel. Ryan v. Agpro, Inc.*, 214 Ill. 2d 222, 228-31, 824 N.E.2d 270, 273-75 (2005) (finding that the pre-2004 version of section 42(e) did not authorize a court to issue clean-up order and declining to address

19

whether the 2004 amendment provided such authorization). And there is no doubt that

a clean-up was part of what the IEPA was seeking. In correspondence with EMC's

lawyer shortly before the lawsuit was filed, the IEPA said that it

> is going to want Egan to conduct a cleanup of the remaining slurry oil on
> the bottom of the canal, as well as address residual material remaining in
> the barge (and any other 'uncertified' barges) at Egan's facility. . . .
> [B]ased on my understanding of the continuing presence of some slurry oil
> in the bottom of the canal and in the 'uncertified' barge, these constitute
> substantial sources of contamination for waters of the State than cannot
> be left unaddressed and without government oversight.

Pl. Ex. 20 (IEPA e-mail dated May 31, 2005).

Price testified that GAIC received a request for representation of EMC in the

IEPA lawsuit. She testified that in September 2005, she authorized payment for

representation of EMC because GAIC understood there was a possibility that the IEPA

could order further cleanup at the site of the oil spill. Indeed, it would have been difficult

for her to understand otherwise, given the IEPA's communications with counsel making

it clear that IEPA was looking to do just that.

Price testified that she advised counsel to make sure that EMC was aware that

the insurer's defense of EMC would be subject to the terms and conditions of the

insurance policy. She had in mind at the time the policy's limitations and exclusions

regarding actions by state governmental agencies. The letter that counsel sent to EMC,

however, contained no reservation of rights and no specific reference to the limitations

and exclusions that Price had in mind. Rather, it simply stated in a general way that the

defense of EMC would be subject to the insurance policy's terms and conditions. Price

said that she did not review the letter before it was sent to EMC.

At some point, GAIC stopped paying for EMC's defense of the IEPA lawsuit.

The date this occurred and the reasons for GAIC's change of course are not shown by the evidence. EMC continued to defend the suit using both the original attorney and in-house counsel. It paid the outside attorney $32,145.75 in not-yet-reimbursed legal fees and expenses and also incurred $694.29 in litigation expenses. During the trial, plaintiffs withdrew their claim for reimbursement of the alleged cost of the in-house attorney's work.

In June 2008, the federal government filed suit against EMC, including *in rem* claims against the Lisa E and the EMC 423. *United States v. Egan Marine, Inc.*, No. 08 C 3160 (N.D. Ill.). The government filed the suit pursuant to OPA90, the Clean Water Act, and the Rivers and Harbors Act. Via the lawsuit, the government seeks, pursuant to OPA90, "to recover removal costs incurred directly by the [Oil Spill Liability Trust] Fund as well as removal costs and damages incurred by the Fund through compensation paid to claimants." *Id.*, Compl. ¶ 4. The government alleges that at the time of the explosion, the EMC 423 was under the control of the Lisa E, which was the barge's "only source of propulsion or movement." *Id.* ¶ 9. It alleges that EMC "and/or the owners and operators of the defendant vessels" are responsible parties under OPA90. *Id.* ¶ 21. The government's allegations make it clear that it considers both vessels responsible for the discharge of CSO into the canal. *See also id.* ¶¶ 26 & 30.

## Discussion

### 1.    The Court's August 14, 2009 ruling

The Court ruled on August 14, 2009 that EMC was exposed to liability under OPA90 as the owner of the Lisa E (not just the EMC 423) and thus that GAIC was

required to defend the government's 2008 lawsuit against the company. *Egan Marine Corp.*, 2009 WL 2515630, at *3. The Court rejected GAIC's contention that it has performed fully under the insurance policy because it paid the $5 million maximum allotted to the EMC 423. *Id.* at *4. The Court ruled that the separate $5 million in coverage attributable to the Lisa E was brought into play and that GAIC breached the policy by refusing to pay costs over and above the $5 million it claimed to have already paid. *Id.*

The Court's ruling left several matters for trial. The first is plaintiffs' contention that GAIC breached the insurance policy by failing to pay all of the amounts EMC / SWS claimed to have expended in responding to the barge explosion. The second is the issue of what damages, if any, plaintiffs were entitled to recover based on GAIC's breach consisting of the refusal to apply the Lisa E's coverage. The third is plaintiffs' bad faith claim.

**2.      Plaintiffs' breach of contract claim**

The insurance policy required GAIC to pay for (among other things) "[r]emoval costs and expenses" paid by EMC and SWS under OPA90; the insured entities' liability under state law for such removal costs and expenses if they could have been recovered under OPA90; their costs and expenses in avoiding or mitigating OPA90 or parallel state liability; and salvage, offloading, and disposal of cargo, to the extent this contributed to stopping a discharge or "prevent[ing] a substantial threat of a discharge or release under OPA90, CERCLA, or the FWPCA." Pl. Ex. 1, Section B. The policy also required GAIC to pay the insureds' costs and expenses to investigate and pursue a

legal defense against insured claims or liabilities. It specifically excluded penalties imposed under state law, and it limited coverage of OPA90 penalties to $250,000 per incident per vessel.

Plaintiffs contend that GAIC breached the insurance contract by determining that only the coverage for the EMC 423 applied, and not the coverage for the Lisa E; failing to pay all of the invoices that plaintiffs submitted in connection with the salvage and recovery work; cutting off reimbursable expenses as of June 7, 2005; and failing to reimburse defense expenses connected with the IEPA and U.S. government lawsuits.

### a. The failure to consider the coverage for the Lisa E

The Court has already determined that GAIC breached the contract by refusing to apply the coverage for the Lisa E. This determination is supported, in part, by the U.S. government's allegation in its lawsuit against EMC that both vessels were responsible for the discharge of CSO into the canal. It is also supported by the facts underlying that allegation: the Lisa E was the sole source of movement for the EMC 423, and the Lisa E's crew served as the crew for the barge (and performed acts that, the government contends, led to the explosion and discharge).

There is no evidence, however, that this breach by GAIC caused any damage to EMC or SWS, other than any unpaid defense costs in the U.S. government's ongoing lawsuit – a matter on which the Court has already ruled in EMC's favor[4] – and unpaid defense costs in the IEPA's suit, a matter the Court will address below. There is no

---

[4] Plaintiffs initially offered Plaintiffs' Exhibit 6, a collection of invoices and expense records purportedly connected to the U.S. government's lawsuit, but they withdrew that exhibit at the conclusion of Chandra's direct examination.

evidence that these breaches impaired EMC's defense in those cases (indeed, EMC prevailed in the IEPA's suit). In addition, there is no evidence that GAIC's decision that there was only $5 million in coverage is what led it not to pay the plaintiffs' remaining invoices for the recovery work and to cut off reimbursement for costs incurred after June 7, 2005. Though it is true that Price (incorrectly) advised the insured entities in mid-June 2005 that the purported $5 million coverage limit had been met, it is undisputed that GAIC paid further amounts to the insureds after that date for pre-June 7 costs. In short, though plaintiffs have proven that GAIC breached the contract by applying only the coverage for the EMC 423, they have not proven any additional damages were caused by this breach beyond any unpaid defense costs in the two lawsuits.

### b. GAIC's determination of plaintiffs' costs of doing the work

Plaintiffs were unable to convince GAIC in 2005 that the amounts they had billed represented only their costs and no profit and thus were properly reimbursable under the insurance policy. That, however, did not preclude plaintiffs from attempting to prove in this Court that the amounts they billed were, in fact, their costs.

The Court is not prepared to say that the methodology advocated by Levito and Neumann was the only proper way to determine what EMC and SWS's costs actually were, or that plaintiffs had to prove their costs to the penny to be able to recover them in this action. Egan and Chanda testified that their proposed billing rates approximated their costs because they amounted to the rates that the two entities charged in 2004, a period during which, they said, they were not making a profit and indeed were losing money. This may well have been an acceptable method to prove that what they billed

24

to GAIC / Meredith did not include a profit.  But the bare testimony of Egan and Chanda was unpersuasive, and plaintiffs made no effort to corroborate the testimony.  Among other things, they did not attempt to replicate at trial the analysis, such as it was, that led them to conclude in 2004 that the companies were operating at a loss and that a twenty-five percent rate increase would get them into the black.[5]  Nor did plaintiffs attempt in any other way to demonstrate that they charged GAIC only at their cost for the work they did, without a profit and without including overhead and other expenses not properly attributable to this work.  The fact that charges for equipment use, Egan's time, etc. were incorporated into the rates unquestionably indicated that the companies were not trying to gouge GAIC.  But a conclusion that plaintiffs proved by a preponderance of the evidence that the unpaid charges represented their costs and not a profit would require too many inferential leaps.

Indeed, plaintiffs made no real attempt to prove in the lawsuit that the charged rates represented their costs.  Rather, they relied on what they contended was an agreement by Neumann on GAIC's behalf to pay the invoiced rates.  As the Court has found, however, plaintiffs failed to prove by credible evidence that there was such an agreement.  Indeed, their claim of an agreement was directly refuted, as the Court has noted, by contemporaneous and near-contemporaneous documentary evidence that made it clear that EMC and SWS's claimed costs – not just employee hours – were

_____

[5]  Plaintiffs introduced an "analysis" by outside accountant Iwanicki that was given to GRS / Meredith in April 2005 to try to substantiate EMC / SWS's costs.  This consisted of the expense side of the income statement for SWS for the year 2004.  Pl. Ex. 16.  Iwanicki's documentation, however, did not include the income side of the statement, so this exhibit did not enable the Court to determine whether SWS had, in fact, operated at a loss in 2004.

subject to audit and verification.  Plaintiffs' failure to prove the claimed agreement, combined with their failure to prove that they billed at cost, undermines their claim that GAIC breached the policy by failing to pay the remaining invoiced pre-June 7 amounts.

Plaintiffs also contended that GAIC in effect admitted that the invoiced rates represented plaintiffs' costs.  They argued that by submitting jointly with plaintiffs a claim to the federal Oil Spill Liability Trust Fund for reimbursement of expenses, GAIC effectively admitted that plaintiffs' invoices represented their costs or at least were reasonable.  The second of these points is irrelevant.  Reasonableness is not the touchstone for recovery under the GAIC insurance policy; the issue is whether the charges represent the insureds' cost.  And plaintiffs' contention that GAIC made an admission by being party to a joint claim is a *non sequitur.*  The submissions to the Trust Fund contain no admission by GAIC that SWS and EMC's invoices are those entities' costs.  Rather, GAIC represents that what *it* had paid out to its insured and others are *its* costs.  *See* Pl. Ex. 5(b), internal exhibit 1 ("Optional OSLTF Claim Form" by GAIC).  SWS submitted as part of the joint claim package a form stating that it had "removal costs" of $1,372,043.53, but Egan executed that particular form, not GAIC. The Court cannot tease out of the fact that the overall claim was a joint submission a concession or admission by GAIC that it agreed with SWS's statement that what it referred to as "removal costs" constituted its costs, without a profit, within the meaning of the GAIC insurance policy.

That is not to say that GAIC and Meredith properly handled the matter of billing during the salvage and recovery phase of the project.  As the Court has found, Neumann agreed, on Meredith's behalf and thus on GAIC's behalf, that EMC and SWS

26

could invoice on the basis of labor rates that included equipment and other charges and per-day / per-hour rates for vessels. Then weeks (or perhaps even months) later, after EMC / SWS had kept records and invoiced in reliance on this undertaking by Neumann, GAIC's other agent GRS insisted that this method of billing was insufficient and that the invoices had to be justified on a per-hour, per-man, and per-equipment basis. This made matters difficult for EMC and SWS because they had not kept all of their time – particularly for equipment usage and Egan's time as salvage master – on this basis.

The Court is unpersuaded, however, that EMC and SWS were harmed by this in any way that they could not overcome. They were given, and had, ample opportunity (both in 2005 and in this action) to try to show that they had, in fact, billed at cost. But they were unable or unwilling to prove this, either to Meredith and GAIC in 2005 or to this Court at trial.

There is no indication that evidence that would have permitted the plaintiffs to prove their costs was unavailable to them, let alone that it became unavailable due to Neumann's agreement that plaintiffs could bill on a per-employee basis. First of all, plaintiffs could have provided estimates of their unrecorded time for equipment usage and the work of Egan as salvage master; GAIC would have been estopped from objecting to the use of such estimates, due to Neumann's agreement regarding billing methodology. Alternatively, plaintiffs could have offered in this litigation (just as they could have done in 2005) an accounting analysis or other evidence to show that they had charged at rates that amounted to their costs relating to the salvage and recovery project. Or they could have tried to document Egan and Chanda's claim that they were charging at rates that actually were the same as rates that resulted in zero profit or a

loss in 2004. This could have been as simple as introducing complete corporate financial statements from 2004 and (perhaps) earlier years and calling the companies' outside accountant to testify.

But plaintiffs did not take any of these routes. Rather, they chose to rely on a theory that Neumann agreed up-front to the particular rates EMC and SWS quoted and on the proposition that GAIC admitted the accuracy of those rates after the fact. That theory and proposition were insufficiently supported, as the Court has found.

**c.    The cutoff of reimbursement as of June 7, 2005**

The evidence showed that GAIC paid plaintiffs nothing for claimed costs or expenses incurred after June 7, 2005. GAIC contends that after the Coast Guard stated, on that date, that the recovery work was complete, there was no basis for further reimbursement under the insurance policy.

GAIC's contention is far too simplistic. The insurer was well aware that as of that date, the IEPA was still contending that further cleanup of the canal was required due to petroleum product that remained there following the explosion. The insurer also knew that the IEPA required further cleanup of petroleum residue that remained aboard the EMC 423. This, presumably, is why GAIC initially funded EMC's defense in the IEPA's lawsuit, which was filed at the end of August 2005.

Even though it appears that GAIC paid out the full $5 million in coverage applicable to the EMC 423, the Court has previously concluded that the additional $5 million in coverage applicable to the Lisa E is and should have been available as a result of the incident. Plaintiffs have proven by a preponderance of the evidence that GAIC breached the policy by cutting off its defense of EMC in the IEPA lawsuit.

28

Plaintiffs have also proven that they were damaged in the amount of $32,840.04 due to that particular breach.

Among the amounts that GAIC refused to pay were expenses incurred after the EMC 423 was moved to SWS's yard. Those expenses included the cost of offloading the remaining recoverable CSO, cleaning residue from the barge and disposing of it, and storing the barge there after plaintiffs were no longer able to afford the cleanup work due to GAIC's cutoff of payments.

The GAIC insurance policy covered offloading and storage of cargo to the extent that it "contribute[s] to stopping a discharge or release, or prevent[s] a substantial threat of a discharge or release." Pl. Ex. 1, Section B ¶ 7. The policy also covered costs and expenses to avoid OPA90 and CERCLA liability arising from the incident. *Id.* ¶¶ 3 & 4. The Court must determine whether plaintiffs proved by a preponderance of the evidence that the expenses they claimed to have incurred after the EMC 423 was moored at SWS's yard, or any of those expenses, are covered under these provisions of the insurance policy.

The Coast Guard determined in its letter of May 18, 2005, after the barge had been moved to SWS's yard, that "the cargo currently on board the EMC423 no longer represents a substantial threat of a discharge of oil or a hazardous substance." Def. Ex. 8. On the other hand, the IEPA advised EMC just two weeks later, on May 31, 2005, that the oil remaining in the barge "constitute[s] [a] substantial source[ ] of contamination for waters of the State that cannot be left unaddressed and without government oversight," and it referred to this as a "continuing threat[ ] of contamination." Pl. Ex. 20. The IEPA made it clear that it "want[ed] Egan to . . .

29

address residual material remaining in the barge . . . ." *Id.* The Court concludes the plaintiffs have proved by a preponderance of the evidence that even after May 18, 2005 and June 7, 2005, plaintiffs were still exposed to liability under OPA90 or the Illinois equivalent based on the material that remained on board the EMC 423.

The complaint the IEPA filed in state court about three months later, at the end of August 2005, referenced only the actual spills and not any ongoing threat of further contamination. *See* Def. Ex. 53. There is no direct evidence regarding why the IEPA's complaint made no reference to the possibility of additional contamination. Based on the evidence submitted, however, the Court infers that the offloading had been completed by that date and that enough cleanup had been done to eliminate a viable threat of further contamination of the canal. *See generally* Pl. Ex. 10 (documents regarding disposal of waste taken from the EMC 423).

Because it appears that plaintiffs were no longer exposed to OPA90 or state-equivalent liability as of August 31, 2005, they have failed to show that the alleged cost of storing the EMC 423 at the SWS yard or further cleanup after that date is covered under the GAIC policy. The Court concludes, however, that plaintiffs have shown by a preponderance of the evidence that storage and cleanup costs they incurred after June 7, 2005 (GAIC's apparent cutoff date) and before August 31, 2005 are covered by, at a minimum, paragraphs 3 and 7 of the coverage section of the GAIC policy.

In addition, the evidence showed that in offloading and disposing of the petroleum residue left on the EMC 423 after the explosion, plaintiffs incurred the risk of further liability under the environmental laws. This led the IEPA to issue a violation notice, as the Court has discussed, which in turn required plaintiffs to incur further

expenses to avoid additional liability. The Court concludes that plaintiffs have proven that these expenses are connected closely enough with the offloading and disposal to be covered under paragraphs 3 and 7 of the coverage section of the insurance policy and that they are also covered under paragraph 4, which concerns expenses to avoid liability under CERCLA.

That leaves the question of the amount in which plaintiffs were damaged by reason of these breaches. As the Court has noted, *see supra* at 10 & n.1, plaintiffs incurred $10,215 in consultant costs that are recoverable. Determining their costs relating to the offloading / disposal and storage of the EMC for the period from June 7 through August 31, 2005 is more difficult. The evidence showed that plaintiffs issued the following invoices for that period:

| Invoice # / date | Amount |
|---|---|
| 58725 / 6/15/05 | $39,538.76 |
| 58726 / 6/22/05 | $48,885.32 |
| 58727 / 6/29/05 | $44,479.39 |
| 58728 / 7/6/05 | $29,225.00 |
| 58730 / 7/13/05 | $35,996.88 |
| 58734 / 7/20/05 | $40,615.00 |
| 58736 / 7/27/05 | $35,155.00 |
| 58740 / 8/3/05 | $28,467.50 |
| 58744 / 8/10/05 | $30,075.00 |
| 58747 / 8/17/05 | $39,142.88 |
| 58749 / 8/24/05 | $26,072.40 |
| 58758 / 8/31/05 | $21,808.75 |

| | |
|---|---|
| **TOTAL** | $419,461.88 |

Because plaintiffs have not proven by a preponderance of the evidence that these invoices represented their costs, the full amount is not recoverable. The Court finds that there is evidence sufficient to award plaintiffs damages for the same proportion of these invoices as the proportion that GAIC paid on the pre-June 7 invoices that EMC / SWS submitted. The evidence showed that GAIC paid SWS / EMC about $2,552,300 and that $1,372,043 that was invoiced through the end of November 2005 remained unpaid. *See* Pl. Ex. 5B. The amount invoiced after June 7, 2005 was $723,710, meaning that $648,333 invoiced pre-June 7 was not paid. What this means is that GAIC paid eighty percent of the amount invoiced by EMC / SWS prior to June 7, 2005 ($2,552,300 divided by $3,200,633). A party is not required to prove damages with precision, and the Court believes that there is sufficient evidence to support a damage award of the same eighty percent of the post-June 7 / pre-August 31 invoices. Eighty percent of that amount is $335,569.

In sum, the Court awards plaintiffs a total of $378,624 on their breach of contract claim ($10,215 + $32,840 + 335,569).

**3.     The bad faith claim**

The GAIC insurance policy provides that its terms "shall be construed pursuant to, and the rights of the parties hereto shall be governed and controlled by, the general maritime law of the United States; and in the absence therefore, the laws of the State of New York." Pl. Ex. 1, section E ¶ 18. There is no controlling authority that admiralty law provides an independent tort claim for breach of a duty of good faith and fair

32

dealing in connection with a maritime insurance policy. The Court has previously concluded, however, that New York law permits such a claim. *See Egan Marine Corp.*, 2009 WL 2515630, at *6.

Under New York law, there is no independent claim for breach of good faith and fair dealing if it is based simply on the conduct that forms the basis for a breach of contract claim. *See Cary Oil Co. v. MG Refining and Marketing, Inc.*, 90 F. Supp. 2d 401, 419 (S.D.N.Y. 2000). That is the case here. Plaintiffs have not shown any conduct separate from GAIC's contractual breaches that would give rise to a tort claim. In addition, plaintiffs failed to show that GAIC acted in bad faith in declining to apply the coverage for the Lisa E, in turning down the balance invoiced by plaintiffs prior to June 7, and in determining that costs incurred after June 7 were not recoverable. To the extent some of these decisions were erroneous, the evidence showed that they were made in good faith and without malice. The Court therefore finds in GAIC's favor on plaintiff's claim for breach of good faith and fair dealing.

## Conclusion

The Court directs the Clerk to enter judgment as follows:[6]

On plaintiffs' complaint, the Court finds in favor of plaintiffs on Count 1 and awards them damages of $378,624 and finds in favor of defendant on Count 2. On defendant's counterclaim, the Court finds in favor of defendant on Counts 1, 2, and 6

---

[6] With regard to GAIC's counterclaim, the Court previously dismissed counts 8 through 11; found in favor of GAIC on counts 1, 2, and 6; found in favor of plaintiffs on count 7; now finds in favor of plaintiff on counts 3 and 4, because the policy in fact covers OPA90 civil penalties to some extent; and finds in favor of plaintiffs on count 5, because GAIC is required to defend the entire suit, even if some overlapping claims may not be covered.

and in favor of plaintiffs on the remaining Counts.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  February 1, 2010